I will hear counsel in Kisano v. Invest. If he leads the court, I'm Larry Elliott and I'm here on behalf of Akiva Sapir. We have laid out the facts in this case. Mr. Elliott, I practiced law in this city for, pretty active practice, for 16 years. I can't imagine a district judge in this city giving a TRO or a preliminary injunction like this. I found it astonishing, but I've been in front of Judge Schwab before and he likes to move cases. When this case started, he wanted me to come to a compromise with the other side. And that compromise was, how much of this account, which at the time we didn't know how much was in this account. I had only been on this case a short period of time. I'd actually returned from Israel on the Sunday before the Monday when this thing was filed. We didn't know how much was in this account. He was a duty judge here. He wasn't the judge assigned to the case. Correct, Your Honor. One of the judges withdrew from the case and he came in and gave us 24 hours, essentially, to respond to the motion. Did you seek any additional time? I didn't, Your Honor, because as a lawyer, I had a right, I thought, to assume that on a record like this, and I knew that there was not going to be any live evidence given. Mr. Marks had told me that. You declined the specific opportunity to present evidence and testimony. You were asked that and you said no. As did the plaintiff. That's right. The plaintiff has the burden of proof here. I knew that the plaintiff was not going to present live evidence. Well, wasn't he in Israel? Exactly, Your Honor. I had no opportunity to present live evidence. But since I knew the court was not going to hear live evidence... No, no, no, no, no. He asked you and you said no. You didn't say, my client's in Israel. I want to get him in so he can testify. Because on the record that was in front of the court, there was no way an injunction could issue, Your Honor. Well, you know what...  Have you ever been wrong before? Absolutely, Your Honor, and I've been wrong in front of, and I've been up here in front of this court before, and I've been wrong in front of this court. But in this case, Your Honor, on this record where every single fact was rebutted, there was evidence about contracts governing the rights between these people. There were essentially two big issues. The first was the Warren deal. We presented a contract. It was an integrated contract. It covered the deal, and we presented the evidence showing how the deal was put together. There's something behind this. There's a back story to this case. I mean, I've been around for a long time, and there's something that we don't know. I'm not sure I want to know. In this case, they're just, I mean, you know... I would agree with you, Your Honor. We have put, right now, there's a motion to dismiss this case. There's a motion for forum nonconvenience in this case. What is the status of the case, by the way, before it's testified? Right now, we have filed our motion to dismiss the case, and we have filed our motion for forum nonconvenience. They have not yet responded to those motions. They will be responding. You move to dismiss for lack of subject matter jurisdiction and for failure to state a claim. And for lack of standing and for a number of other things. Standing is part of the jurisdictional thing. And it's now before Judge Conte. That's correct. That is correct. So if we were to, for some reason, send this back on the preliminary injunction, she'll have to start from scratch here because Judge Schwab was only the duty judge. You would agree we're down here to $895,000 in money. We didn't know that at the time. Well, you know it now, and you could go back. Provided you could get the order modified. How much is the Monaco apartment worth? There's no testimony on that. We believe about a million dollars. But you say you've represented you're not going to transfer or get rid of the Monaco. We're talking about $895,000, not $6.5 million. That's correct, Your Honor. Okay. So the Monaco apartment is – I thought it was purchased for Mr. Sapir in 2005. It was purchased. He is the owner, but he has leased it at this time. So he's the owner, and you say it's worth about a million dollars. I believe that's right. And then in the Swiss bank – It might be a million euros. Excuse me. A million euros. So that would be about a million four or roughly. Not a million four, a million two. The money in the Swiss bank accounts is what, 893,000? Something like that, Your Honor. So we're essentially talking roughly about $2 million American dollars. Correct. I don't know that the apartment was ever in dispute. There's been almost an agreement it's not going to be moved, and nobody disputed that. Well, we obviously – when I was asked what the harm was, the harm is these are property rights, and he's being deprived of property rights. But you talked about cash. I mean, that's what the argument for George Schwab was all about. Correct. Because you agree that the client's not going to transfer the Monaco apartment, and so they moved on to the cash. And it started off and it ended up at $6.5 million because that was the figure that was presented then. The allegedly fraudulent amount. Well, I know. That was the amount that was frozen. And now we're really down to $895,000, and certainly if you went back the order could be modified to that amount now. And if you go back before Judge Conte, that's what you're talking about in terms of money now. That is correct, Your Honor. But let's – this is what happened when I was in front of Judge Schwab. I constantly said step one is a likelihood of success on the merits. Three times I tried to make the argument. Three times I was shut off or shut down. The fact of the matter is there's a very high burden of proof here. That high burden of proof was on the plaintiff in this case, Mr. Shulman. Mr. Shulman doesn't have standing in this case. He didn't pay one penny of his money. You never raised standing before Judge Schwab. I did, Your Honor. It was in the brief we submitted, and I raised it in order. I didn't see a word of it argued at the time. When I tried to argue it, I was shut off. But I did raise it, and it was raised in our brief submitted at that time. And we've raised it again now on the motion to dismiss. That was fully briefed, yeah. And it's been fully briefed, right? I mean before Judge Conte. Correct. Correct, Your Honor. But we raised it in the brief. The reason you argue standing is what? Instrad entered into the transaction with respect to the Warren, Ohio, steel facility. Is that correct? Correct, Your Honor. Instrad no longer exists? Instrad was dissolved by Mr. Shulman and his partners at some point. But Mr. Shulman also is saying that he personally was the victim of somebody who was purportedly his agent, not doing the agent's job. Isn't that what he was doing? My understanding is that Mr. Mamo, who was the Maltese lawyer who dissolved the company, did it on Mr. Shulman's instructions. And under Maltese law, once that's done, the company— The deal was not your argument, I think. The deal wasn't done by Shulman. It was done by the now-defunct company, and the company was the injured one, not Shulman. So Shulman doesn't have standing. Absolutely. There's other plaintiffs in this action. But the only plaintiff who was moving for an injunction was Shulman. That's right, was Shulman. And so basically what the court did was flip the burden of proof and made me come into court and try to— How are you harmed? And I gave him the obvious answer. My client doesn't have access to his funds now, and my client, his property rights, if he wanted to sell his property in Monaco, that is being denied. That wasn't good enough for Judge Schwab. We're in a country where property rights are sort of the basis of our society, of our laws. He kept saying, how are you harmed? And I kept saying, I'm being deprived of property rights. My client is being deprived of property rights. And when I would try to focus the argument on a likelihood of success on the merits, in which on this record there is no way you could find a likelihood of success on the merits because all you have are competing affidavits, and the competing affidavits are entirely contradictory. There are two completely different versions of this story. And when you have affidavits, the judge can't resolve the conflict in that situation. And so there is no factual basis whatsoever for a finding of likelihood of success on the merits. And yet this extraordinary remedy was granted without such a finding. No further questions.  At the last, or the afternoon before the hearing, we had a supplemental motion where they raised an issue regarding property in New York City. The property, and then we filed in response to that, we filed a settlement agreement that dealt with the property in New York City. It's long since been sold. The Christopher Street property? I'm sorry? The Christopher Street property? Yes. This involved apartment buildings in New York. It was a deal that Mr. Shulman and Mr. Sapir had entered into. It was subject to a settlement agreement. That settlement agreement is subject to Israeli law and has a forum selection clause in Israel, which makes sense since both of them negotiated the contract in Monaco, and they're both Israeli citizens, and they both signed this document. Judge Schwab should not have heard anything about that. But the asset purchase agreement lists Sapir as residence, or not residence, where he was getting his mail. Was it the Radisson Hotel in Greentree, Pennsylvania? He was there temporarily, Your Honor. But that's... I mean, there is some connection to Pennsylvania. I'm not denying it. What would the alternate be? I mean, what did you tell the court? In order to say you can't have Pennsylvania law, you have to have a viable alternate. What was the alternate? If there was a – if there was a – if they're going under a breach of fiduciary duty claim, all of the negotiations about these properties occurred in Monaco. Mr. Sapir and Mr. Shulman have apartments that were, at that time, were right next to one another in 2005. They've been in a number of business deals for many, many years and finally have... It's a potential of five different countries' law. Correct. You haven't told us which one has more of an interest than Pennsylvania, much less that there was a conflict between those laws. In the Warren transaction, the negotiations occurred in Monaco. The money was sent from Malta. Two of the payments went through a Pennsylvania bank to the Swiss bank. Four of the payments went from Malta to the Swiss bank. It's a mess. It's absolutely a mess, but it was not... Everybody assumed Pennsylvania law applied. I did, Your Honor. Well, I don't see it in the transcript. I mean, Judge Schwab assumed Pennsylvania. He was a duty judge. He had a motion to decide. I mean, none of this – a lot of this, but I don't want to say stuff, what's the legal way. None of these – a lot of these allegations, issues were never raised. It was a TRL merely converted to a preliminary injunction hearing over no objection. Correct, Your Honor. On the other hand... Why didn't you object? Your Honor, because I was assuming under these facts and just on affidavits, no injunction could issue. Maybe I made a bad call there. I mean, you represent – I mean, the two parties involved in this are millionaires. Correct, Your Honor. They didn't have lawyers who really took care of their interests? Your Honor, I thought this through. I'd been in the case.  I looked at the facts. I refuted every fact under the Third Circuit law. If there are competing affidavits, the judge is not allowed to make decisions on credibility under this record. Well, what credibility? Nobody testified. Exactly, Your Honor. How do you have credibility? He didn't go back in afterwards, after he ruled. He didn't go back in and say, wait a minute, wait a minute, you couldn't do this. You couldn't do this. You assumed, you're saying, he couldn't do it. You know what the definition of assumed is. Okay. I don't. I'll tell you later. But, you know, you could have gone back in and said, wait a minute, we said we're not going to put on testimonial evidence, but you've diametrically opposed stories here. You can't decide it the way you did anyway. And nobody went in afterwards to do that. Well, I was trying to argue that, and I was constantly shut off. And second, we immediately took an appeal. Yeah, an appeal. Yeah, I know. I'm very aware of that. But you never went back in to judge him. I did not, Your Honor. We did ask that Discovery stay pending these motions that we have, a number of things, all of which have been denied. Did anybody try to settle this? This is not a case that is going to settle. Well, we have a very good mediator. I'm not saying that at some point down the road. It couldn't happen. But right now, these two who are wanting to leave. Do these two gentlemen still have deals together? No, they don't. They wrapped up all of their deals. Do they still have apartments next to each other? Excuse me? Do they still have apartments next to each other? I don't know if Mr. Shulman still owns the apartment next door. But Mr. Sapir leased his. Yes, he leased his. Thank you. I'm sorry, my time's up. Thank you. Now we're going to hear a completely different story. If it pleases the Court, I'm Bruce Marks. I represent Mr. Shulman and the other plaintiffs. Normally I enjoy being an appellee, although having heard the first two arguments in the beginning of this one, I see that there may be some challenges. I'll just start from the beginning. Sure. I have asked the law clerk yesterday, Dina, to just pull randomly cases where there have been preliminary injunctions or TROs entered. And as you know, Rule 52A2 and 65D1 require that a court give reasons. And the two that were just pulled randomly had findings of fact that were extensive and conclusions of law that were extensive. And here we've got three and a third pages of nothing but conclusory statements that he satisfied the standard for obtaining preliminary injunctive relief. He's established a prima facie case that he was reasonably likely to prevail. And I could just go on and on and on. There is no reasoning in this order whatsoever. So no findings of fact, no conclusions of law. Your Honor, in the Kresge decision which I have behind me in which Judge Slobiter was on the panel, this circuit issued a decision that said unless you raise the issue below that you have not complied with Rule 52, it is waived. You know, I know that. But the district court also has a responsibility to follow the rule. And the fact that the party's lawyers didn't insist on it doesn't let the district court off the hook. I mean, I have been in, I can't tell you the number of preliminary and the TROs and preliminary injunctions. We got thrown out of court if you don't come in with the right things. And in this district. All that we have on, like the plaintiff established a prima facie case justifying equitable relief that he was reasonably likely to prevail on his claims of unjust enrichment, fraud, and breach of fiduciary duty and his claim under the Pennsylvania Uniform Fraudulent Transfer Act. And we have a truth. That's conclusive. You've got to give reasons. I only represent Mr. Shulman. I heretofore did not represent the district court. However, if. Yeah, but you're trying to uphold the district court. Which, of course, I'm trying to do that. You're the appellee. The first issue is if they had a problem with it, the law of the circuit is that they had to object. They didn't. If they had objected or if they had even put this in their notice of appeal, I could have gone back to the district court and I could have asked the district to amend his findings. The district court essentially adopted your order, did it not? The district court adopted my proposed order, but I, of course, didn't know what was going to happen at the hearing. So it would normally. Well, you knew that you weren't going to have a. I mean, you're the plaintiff, right? Yes, Your Honor. Okay. And the cases that I've been involved with, I mean, we would spend hours putting together. If we thought the court was going to adopt what we were doing, we would draft the findings of fact and we would draft the conclusions of law. And we'd be on the other side. Well, let me just speak for the poor district judge, having been one for 16 years, when everybody says, that's okay. I don't want to do anything. It's all, you know, here. Your Honor. And then the district court gets reversed because it did something wrong when nobody asked it to. And indeed, they specifically said, we don't want to do anything. That's one right over the plate for you. Your Honor, that's exactly the point. Mr. Elliott conceded. He assumed he was going to win. So he decided this was fine. He didn't object to consolidating the preliminary injunction hearing with the TRO hearing. He didn't object. It was fine. Yeah, but shouldn't the district court have refused to do that? You have to give notice. I mean, you have to. The rules tell you what to do. Your Honor. Your Honor, Mr. Elliott is an experienced lawyer. They knew about this case. As it turned out, because of discovery, we found that he had been wired as retainer six weeks before we filed the motion. He went to Israel and he met his client weeks before. And we didn't know that he had counsel. We filed first for the TRO because before we gave notice, we were afraid that the assets were going to be dissipated. You deserve each other, frankly. Within minutes, Your Honor, within minutes of us filing for the TRO, he entered his appearance. He could have said, Judge Schwab said, please go before Magistrate Judge Mitchell, see if there's something that you can do to agree on some period of the TRO. Not the amount of the TRO, a period. He didn't want to do it. Mr. Elliott wanted to knock the ball out of the stadium. He could have asked for a testimonial hearing. If we ruled against you and sent the matter back, you could still go before Judge Conte, could you not, with the same request? Well, of course. Only now you have more evidence, right? Well, Your Honor, first of all, we have an order restraining the transfer of the apartment and of the money. Apparently the apartment's not an issue from what you told us before. Your Honor, I don't know what he's going to do once this order, if you were to vacate the order. He could sell the apartment. He could encumber it. He could do anything. That's why we got the order. The money could fly out of the account the next day. At a minimum, we ought to have a TRO in place. If you had any, if you had a sense of. . . If you went back to Judge Conte, given what's come out now. . . In fact, it came out the very day that Judge Schwab ruled that there was a transfer of $900,000 into the UBS account in Switzerland. Well, it was in the account. In the account. Well, it was transferred to UBS in Switzerland. It was already in the account. And it was ordered not to send the money out. Go ahead. Yeah. Well, would you agree that that's the only money issue now? Yes, because we didn't catch anything else. If you went back before Judge. . . If we said you go back before Judge Conte, that would be all you'd be seeking to freeze. Well, Your Honor, we could go and we could try to trace where these assets went. You have to understand our position is that there was initial fraud in which our client was duped into. . . Twelve years ago? Are you going to now. . . Is that what you're doing? Erase Judge Conte with year after year of secret transactions? Your Honor, there was a fraud. . . Eleven. If I could just discuss the evidence, because Mr. Elliott tries to portray this as one affidavit against the other. Judge Schwab had a hearing and he reviewed the documents. . . if you get a judgment. What evidence is there? Well, how about him hiding money? Let's talk about the six transactions of $908,000. He sent a letter. . . He purchased this for $6.6 million. He told my client. . . Is there any evidence in the record that funds other than the bank accounts in the apartment are not available to satisfy a judgment? Yes, because, Your Honor, one of the things that we were doing was we were attempting to find if Mr. Sapir had any assets, and we couldn't even find where he lived in Israel because he had no property in his name. But let's look at what he did. He sent a letter to my client. This is in the record, an exhibit to the complaint. He said, good news, Vadim. We've purchased it, and Steel Equipment Corp. is going to finance it. They're going to finance it. And you have to send them six payments of $908,000, four payments to the account in Switzerland, which he makes it look like it's Steel Equipment Corporation's account, and two payments in Pittsburgh of $908,000. At the hearing before Judge Schwab, it seemed like the primary evidence was standing up and saying this guy is a, quote, fraudster, close quote. No, Your Honor. Then after he sent that letter, this is in the record. This is at pages 185, 187, 242. He then sent a letter on Steel Equipment Corporation letterhead, which we have on one page, saying send the money, four payments to Switzerland, two payments to Pittsburgh. Okay? As it turns out, we have the sworn responses to interrogatories of his co-defendants, Mr. Lemster and Steel Equipment Corporation. This letter was forged. They didn't send it. Sapir forged the letter, making it appear like Steel Equipment financed the money, and then to dupe my client. I assume that one of the issues before Judge Conte and the motion to dismiss is a statute of frauds or statute of limitations? No, not on this claim, Your Honor. Not on this claim. This was only discovered when we pled it. It was only discovered when we pled it. So they have not alleged that the 2001 transaction claims relating to that are to be dismissed by virtue? No, Your Honor. No, absolutely not. This was only recently discovered. I'll wait until rebuttal. I'm sorry. I think your opposing counsel will disagree with that. Your Honor, we have a RICO claim. It's a four-year statute. They have not sought to dismiss that for the statute of limitations. And in regard to the worn equipment fraud, they've asserted the statute of limitations as to the claims of Trasteco and Cassano. But as to this, no, because it was only recently discovered. Your Honor, I don't assume that your family was from Russia. And I came to you and said, Judge Slobber. Well, they're not. Okay. Good for you. But assume that you had a family from a faraway country. And I came to you and I said, Judge Slobber, I've got good news. You have a prince in your family who actually left money in Russia that you could recover. And if you give me $10, I'll get the money for you. All you have to do is sign the form. Found money. You go ahead and sign it. Years later, you find out that you only got half the money because somebody went to that country and deceived you. And you don't speak the language. You don't read the language. This is the same thing that happened to Mr. Shulman. He's a businessman from Ukraine. Okay. The country changed after the dissolution of the Soviet Union. And he appointed somebody. Where does Mr. Sapir live now? Mr. Sapir lives in Israel. Why wasn't the suit brought in Israel by Mr. Shulman? Because initially we only sued Mr. Lemster and we only sued Steel Equipment Corporation because we thought they were the primary wrongdoers. They said we don't have very much money. So we went and looked at the transactions. And so we went to their lawyers and we said, Well, how about his account in Switzerland? How can you tell us he doesn't have money? The account in Switzerland got all this money. He said it's not his account. Well, we said, What do you mean? We have a letter from his company telling us to send money to the account. He didn't do the letter. We only learned at the beginning of this year when we investigated it that it was Mr. Sapir who was behind that fraud. And immediately thereafter we amended the complaint and we sought the relief. But, I mean, to go back, we've cited the cases. He had the opportunity to object to consolidating the preliminary injunction hearing with the TRO. He didn't do that. I'm sorry. No problem. He had the opportunity to say, Listen, only do a TRO because I want to have my client testify. I want my client to testify by videotape. I want to bring my client over here. I want to cross-examine Mr. Shulman. I think that Mr. Lempster is lying when he says he doesn't know about this letter. He could have asked for a testimonial hearing. He didn't do it. So he left it up to the judge to decide, based on the papers, based on just not what Mr. Shulman said, but what the co-defendants said. You have co-defendants saying, We have nothing to do with this bank account. You have co-defendants saying that this letter is forged. And based on that, Did you say forced or forged? Forged. Forged. With a G. Forged with a G. Okay. Mr. Sapir, it's our allegation, he didn't deny sending a letter, forged the letterhead of SEC to make it look like they were financing the transaction and they were not. You cited at the outset what case that says that you have to object to a judge not giving you findings of fact and conclusions of law. Is it Kresge? Yes, Your Honor. And where is that cited in your brief? Where is it cited in my brief? Sure. It was their last argument. I'm looking at the table of cases. Sure, Your Honor. It's on page, it's Danny Kresge, so it may have been listed under a D. It's Danny Kresge Corp., so it would be under D. I see it now. Your Honor, and it's on page 50. And again, Judge Sloverter was on the panel. I remember the name, but do not remember the case. Well, it was only 29 years ago. We consider that recent precedent. I've been here 33 years. I'm sorry, Your Honor. And the issue is can you folks review this? On the issues of law, and again, we only, again, this is subject to an abuse of discretion. On the issues of law, you know, these are issues of law that are briefed. They have a motion to dismiss pending. What is your response to that? I think Mr. Elliott erred. Our opposition to the motion to dismiss, which is essentially a 12B6 motion, has already been filed. That's what it was my understanding. Yes, it's already been filed. They've already replied, actually. So as to the motion for forum non-convenes, our response, I believe, is due on Tuesday, and it will be filed either Monday or Tuesday. And that's where, you know, Mr. Lemster and SEC, because they don't like the law here in the United States, and again, the Pennsylvania law, two of our three defendants are based in Pennsylvania. The money was sent to Mr. Lemster's account in Pennsylvania. The money was laundered through his account. We have a solid basis, and they never suggested whether the law would apply and if there were any differences. And as we all know, then there's a false conflict, and the court can apply the law of the forum, which is what we argue. We don't know because nobody raised it before us. Nobody told us which law should apply. It wasn't briefed. We just assumed Pennsylvania law would apply for purposes of that motion. Right, right. So, therefore, there's no issue that this court would have to address. But, again, to get to it, if the court was inclined to send this back, at a minimum, the TRO should be in place, and then we would go back to the district court, and the district court could schedule a hearing. You can't agree on that, the two of you? Can you agree on anything? Well, I don't agree. Your Honor, I don't agree that it should be reversed. I think that we did everything that we could in front of Judge Schwab. He was faced with a situation where there were serious allegations of fraud. There were documents in the defendant's own hand that would support our allegations of fraud. The co-defendants said that, based on their answers under oath, that the letter was forged and they had nothing to do with the account. Is the fraud that you're complaining about still the difference between $6 million and $12 million? It's $13 million and $6.6 million. But, yes, as to Mr. Shulman's claim, the other secret deals, the Cassano and Trasteco, have other claims that are not subject here. But, yes, that's the fraud that we have. And that's, like, 10 years ago? It is, Your Honor. It is, but it was a well-concealed fraud. And it was concealed by using forged documents. I don't understand that because I thought I read someplace that it was all in the papers. The actual amount was in the papers, and all they had to do was read the papers. And you would think that with a deal of this magnitude, somebody would have bothered to read the papers? Your Honor, it's not an issue on this appeal. That's not the point. The point is that you're claiming that this was all secret, and I can't understand why people don't just read the papers. Because Mr. Shulman doesn't read English. Mr. Shulman was in Ukraine. He trusted Akiva Sapir, who was fluent in Russian and English,  But he had lawyers. He didn't have lawyers. He didn't have lawyers. Akiva Sapir was a lawyer who was his agent in handling this transaction for him. That was it. It may seem strange that people do business in an informal way. It's not so strange for those of us who do business in Ukraine and Russia like I do. I'm there every week, a month. These are people who are unsophisticated, who came out of the former Soviet Union in the late 1990s with opportunity, and they look to people whom they could trust. And he was introduced to Mr. Sapir, and he trusted Mr. Sapir, and it turns out that his trust was misplaced. But that was his guy. What happened to the $6 million difference? Akiva kept it. Mr. Sapir kept it, of course. He has it. Where it is, we don't know, because as the record revealed, Judge Schwab ordered him to disclose what happened to the money, and not surprisingly, the Credit Suisse bank account where the $6 million went was closed like a few months afterwards. It's interesting. I think it was right after the amended complaint was filed. The account was closed. No, I think the Credit Suisse, they said the Credit Suisse. Credit Suisse, whatever. Yeah. Well, actually, I think it was, I think, Your Honor, it was closed shortly after the monies were transferred in 2001. And the complaint was filed on May 11, 2012. Yes, Your Honor. Naming Sapir as a defendant, Shulman as a plaintiff. Right. On 6-21-12, the return of the subpoena by UBS disclosed that on May 23, two weeks after the amended complaint was filed, Sapir transferred $900,000 to the UBS account. To the UBS account. Yes. No, not the Credit Suisse account. The Credit Suisse has nothing in it. Right. But that was the primary account that was used for the transfer of the $6 million. And, again, on the evidence of fraud, these other commissions, we allege Cassano-Costeco, they were secret deals. Every time that Mr. Sapir got paid, it was to an account that wasn't in his own name. Okay, to Ricky Ticci somebody, to companies that were, I hate to misquote Kipling, but it was similar to Ricky Ticci Toffee. So there was an addition of fraud to the judge. This was discussed at the hearing. It was in front of the judge. It wasn't just like you don't know whether he read it or not. This is what I laid out for. I think the argument is maybe not that the evidence wasn't enough for Judge Schwab to have done what he did, but he had to set forth, you know, a couple more statements on the record. Well, I think the issue is whether it's reviewable by this Court. If the Court can review what happened and there's not a lot of evidence. Well, how can we not review it? It's before us. No, no. I mean, in affirming the injunction, is there enough on the record, given his conclusions, that you could affirm it? There's not a lot of evidence. I mean, part of the problem is that, as you cited in your footnote on page 50, that our Court has held that no matter what the other side does in objecting or not objecting to Rule 52A, where orders are so devoid of compliance that the Court of Appeals could not exercise review. That's the standard. And I can't really exercise review without any findings of fact. There's nothing there. I don't know what to say. I mean, you may be right. I mean, you may be 100% right. And maybe that something should happen because, you know, you did ask for an equitable relief, so you're not necessarily precluded by Grupo Meccano, the Supreme Court decision. Correct. I mean, that may pertain to damages, money damages, but not necessarily to equity. But you've got to have something. Well, he found that we had – He didn't make any findings. That's the point. Well, he said we established a prima facie case justifying equitable relief that was reasonably likely to prevail. That's the conclusion. That's not a finding that leads you to the conclusion. There's no rationale whatsoever given in this three- and a third-page order. And, again, your client may be 100% – I mean, he may have every sympathy in the world, but I don't know how to review this. Won't Judge Conte be lucky if we send it back and say we need another half a page? Well, or much more. Well, Your Honor, while this is pending, we could move in the district court. Pardon me? I would suspect while this is pending, we could move in the district court now and ask the district court to make amended findings of fact and conclusions of law. All right. Excuse me? She didn't have the case. She didn't have the case. Again, I don't know whether it would go back to Judge Schwab. No, no. He was the duty judge. I've been there and done that. That's just for that particular day, that particular motion. It would go to Judge Conte. Right, right. I think under the rules of the district court, they are here. Right. But it would seem to me the issue would be that at a minimum we should retain the temporary restraining relief. Well, you would think so because you're the appellee. Right, right. But my point being is that there's a risk of dissipation. That's why, at least so Judge Schwab concluded, even though he could have perhaps put more in the opinion. And if that's the case, then at least the TRO should be affirmed. It should be sent back to the district court with instructions to further consider the matter. Having presented this, it wouldn't be fair to us if there really is a risk, as Judge Schwab concluded, of dissipation to have this lost between the appellate court and going back to the district court. Is there such a thing as – well, never mind. We can worry about that. Yeah. Okay. Listen, I got the point. And my response to that is give us the temporary relief. It doesn't have to go to the trial. We don't have to give you the temporary relief. We can just think about this for a while and reflect on it. Well, I understand I'm protected right now, but if it were to be remanded, what I'm looking for in the court – What you want to do is protect your client. In the interim. Because neither of you trusts the other. I have fond feelings for Mr. Elliott, but our clients – You may trust each other, but the clients then trust each other. And we would certainly say there's a reason for it. At any point in our recommending, in the strongest possible way, we're going back to Judge Mitchell on this or to Judge Conte for purposes of Judge Mitchell continuing to try to settle this particular motion. Your Honor, Judge Mitchell did a fantastic job on the issue of the bond. That was worked out during the – I actually met with him on this a couple of times. And I'm just curious. The answer is I'm originally from Pittsburgh. I'm happy to go home whenever I can. And they have light, I think. Well, they did. I don't know whether they do now. And it is football season. We would welcome the opportunity to be in front of Judge Mitchell and see if there's any resolution. Maybe we'll ask on rebuttal. Maybe we'll ask your friend whether he would like to go back to Judge Mitchell as well. Fair enough. You've given me an extraordinary amount of time. I appreciate the extra time. And, again, I would just conclude with however the court resolves it, please protect my client's interest in the interim between whatever this court does and our opportunity to go before the district court again. Thank you. May I take just a couple of minutes to clarify a couple of things? Sure. I assume you reserved it. I did. Okay. Well, then you can take it. I want to point out that one of those accounts was closed or stopped being used in 2002. No, I know that. We are now 10 years down the road, and there's still money in one of the accounts. That's the first point. The second point is I want to step back again. Look at what we're doing here. This is a case. We're not doing anything yet. Look at what Judge Schwab was doing here. Can you address the issue about the waiver? Yes, I'll address it. As far as the Rule 52? Yes, sir. Well, I think it was incumbent upon the court to set forth adequate reasons for a TRO. All he did was adopt the proposed order by Mr. Marks. He did not. The point is, afterwards, did you need to object? I don't think I did, Your Honor. I think given the way this hearing was done, I. . . That was your lead argument, that somehow there wasn't due process here, but we're not necessarily buying that. Not even due process. I mean, I accepted service. I mean, I had notice. And you stood up at the beginning, as Judge Berry noted, and said we're not going to put any evidence on them. We're going to rest on our affidavits. As did the plaintiff. Both sides did. Correct. And that therefore created a record that would not. . . You probably thought you had a slam dunk, and it turns out. . . I'm sorry. Maybe I did think that. But we created a record, and I was part of it, And that record is not sufficient to support TRO, temporary restraining order, or any kind of early. It is a tie. And a tie in these cases, you don't issue injunctions. And that's the point I was trying to get to, is that look at what happens if you affirm this order. We're going to go to the Western District now. In every case, somebody is going to move for a TRO and try to freeze assets before the other sides even answer the complaint. That's the kind of precedent. . . That happens quite frequently. It happens when there are. . . In the cases that have been decided, it's where there is evidence of somebody transferring assets out of the United States. Those are the cases where it happens. There wasn't one shred of that evidence here. This money was in Switzerland. Some of it. . . I mean, this account has been used by Mr. Sapir for 10 years. Money has gone in and out of this account constantly. So the idea that we're tracing this money to this account, or the remainder of this money to this account, there's just no support for that. He's been using this account for business deals. And that was the evidence before the court. And how we found irreparable harm, or how we found any balance. In other words, the harm here is an inchoate right to something if you win a lawsuit that's heavily disputed. No. The harm here that was alleged before Judge Schwab is you'll be unable to pay your business expenses if these monies, the $6.5 million, was frozen. Well, we're down to $895,000. And I suspect that Mr. Sapir is not going to rise and fall on that comparatively minimal amount. Would you be able to enter into some sort of agreement or think about or at least talk about some sort of an agreement when you freeze $895,000 and everybody moves on? You know, you move into your motion to dismiss and you move on and everybody gets on with their life. Are you going to... Let me just ask that question. I certainly am willing to talk about it with the other side, Your Honor. My client and his client are not friends. They were at one time. I think we got that idea. I think you understand that. And that's not something I can... Yes, but your friend across the aisle is no longer looking to tie up $6.5 million. We're down to $895,000. And then maybe everybody just says, ah, let's just do it and move on. I mean, we can certainly talk about it. Conceivably, if you win your motion to dismiss... I'm assuming this would be dissolved, yes. Okay. I would say we understand it, but I'm not sure we really do. I just thank you all.